**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES CHADWICK** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | **NO.  21-3991** |
| | **:** | |
| **NORFOLK SOUTHERN RAILWAY** | **:** | |
| **COMPANY** | **:** | |

<u>**MEMORANDUM**</u>

**SCHMEHL. J.**                                                                            **July 10, 2023**

Plaintiff brought this action claiming the Defendant Norfolk Southern Railway Company ("Norfolk Southern") violated the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA") and the Pennsylvania Human Relations Act ("PHRA") when it allegedly: 1) medically disqualified him from returning to work as a locomotive engineer (Count I); denied his request for a reasonable accommodation (Count II); and 3) retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity Commission (Count III). He also claims that Norfolk Southern medically disqualified him and did not offer any vocational assistance because of his age in violation of the Age Discrimination in Employment Act ("ADEA") (Count IV). Presently before the Court is Norfolk Southern's motion for summary judgment. In his Response in Opposition to Norfolk Southern's Motion for Summary Judgment, Plaintiff has conceded his claims for retaliation (Count III) and age discrimination (Count IV). ECF 42 at p.1. For the reasons that follow, the motion is denied without prejudice.

## STANDARD OF REVIEW

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## FACTS

The following facts have either been stipulated to by the parties (where indicated) or construed in the light most favorable to Plaintiff:

1. Plaintiff started working for Norfolk Southern as a locomotive engineer on June 1, 1999 following Norfolk Southern's acquisition of Conrail. Joint Statement of Undisputed Material Facts ("SOF") ECF 40 at ¶ 1; See ECF 40-2, Career Service Record, at NORFOLK_00000425; Ex. 3, Plaintiff's Answers to Interrogatories No. 16.

2. Locomotive engineers operate locomotives and are responsible for moving freight safely and efficiently in accordance with all applicable regulations. SOF at ¶ 2; See ECF 40-4, Deposition Transcript of Shaun McCoy, at pp. 8:18-9:3; ECF 40-3, Ans. to Interrogatory, at Ans. No. 16.

3. Failure to operate a locomotive in a safe manner can impact on an individual's own safety, their co-workers, and the general public; therefore, the Federal Railway Administration ("FRA") deems a locomotive engineer to be a safety-sensitive position. SOF at ¶ 3; See 49 C.F.R. § 209.303; ECF 40-

1, Deposition Transcript of J. Chadwick, at pp. 79:15-19; ECF 40-5,
Deposition Transcript of Anita Euell, at pp. 75:18-22; ECF 40-6, Locomotive
Engineer Job Demand Forms, at NORFOLK_00000444-445 and
NORFOLK_00000446-447.

4.  Engineers must maintain sufficient alertness and concentration to safely
    operate the locomotive which includes monitoring engine speed and air
    brake pressure, moving engine controls, and maintaining communications
    with other personnel, including conductors, to properly control train
    movements. SOF at ¶ 5; See ECF 40-6, Locomotive Engineer Job Demand
    Forms, at NORFOLK_00000444-445 and NORFOLK_00000446-447; See
    ECF 40-4, Deposition Transcript of S. McCoy, at pp. 39:12-40:3.

5.  Plaintiff testified that he understood that there are safety rules imposed by the
    federal government on Norfolk Southern. ECF 40-1, at pp. 44:23-47:7, 51:5-
    11.

6.  Plaintiff testified that he understood that the unsafe operation of a locomotive
    poses a significant risk to the community. SOF at ¶ 4; See ECF 40-1,
    Deposition Transcript of J. Chadwick, at pp. 47:14-48:19.

7.  Plaintiff was at all times relevant to this matter, a member of the Brotherhood
    of Locomotive Engineers and Trainmen ("BLET") union, and subject to a
    Collective Bargaining Agreement ("CBA") which establishes a process for
    challenging medical disqualification. ECF 40-32, BLET CBA.

8.  Plaintiff underwent surgery to remove a brain tumor on August 26, 2013 and
    developed a seizure disorder in 2014. SOF at ¶ 6; See ECF 40-7, September

30, 2015 Physical Therapy Initial Examination, RFPOD 00167; ECF 40-8, June 12, 2014 Neurology Office Visit Notes, at Plaintiff's RFPOD 000147-148.

9. After recovering from surgery, Plaintiff returned to work in January 2014 and remained in-service until he suffered a series of focal motor seizures in 2014 and 2015. SOF at ¶ 7; See ECF 40-7, September 30, 2015 Physical Therapy Initial Examination, at Plaintiff's RFPOD 00167; ECF 40-8, June 12, 2014 Neurology Office Visit Notes, at Plaintiff's RFPOD 000147-148; ECF 40-9, October 9, 2014 Neurology Office Visit Note, at Plaintiff's RFPOD 000141-145; ECF 40-10, February 11, 2015 Neurology Office Visit Notes, at Plaintiff's RFPOD 000138; ECF 40-11, February 19, 2015 Neurology Office Visit Notes, at Plaintiff's RFPOD 00135.

10. In a letter to Plaintiff dated August 21, 2014 which requested further medical information from Plaintiff, the then Director of Medical Services for Norfolk Southern concerning Plaintiff's fitness-for-service as a locomotive engineer, Paula Lina, M.D., wrote, in part:

As information, NS Medical Department guidelines for a Locomotive Engineer with a Seizure Disorder require documentation of the control and stability of the condition, including a minimum seizure free period of **2 years since the date of the last seizure while on a stable medication regimen** or a minimum seizure free period of **2 years since the date of the last seizure while off medication.**

ECF 42-3 (emphasis in original).

11. In a letter dated October 20, 2015, Plaintiff's treating neurologist, Warqaa Majeed, M.D. wrote:

> James Chadwick is a current patient being treated for seizures. Patient may return to back to work. However, patient should not operate heavy machinery independently. No other restrictions or accommodations are required. Patient may do physical activity as tolerated.

ECF 40-12.

12. Ultimately, Plaintiff's seizures were controlled by behavior modification (no consumption of alcohol) and his compliance with prescribed anti-seizure medication. SOF at ¶ 8; See ECF 40-1, at pp 139:4-11, 139:20-140:20.

13. In order to return to work in 2017, Plaintiff needed to renew his engineer certification and underwent a Periodic Health Assessment. SOF at ¶ 9; See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 63:10-21.

14. The Periodic Health Assessment is required by the FRA to ensure engineers maintain their certification. The assessment tests hearing levels, and color and distance vision to ensure the engineer meets the minimum safety requirements. The assessment also includes a questionnaire to report any medical conditions and prescribed medications, and a check of vitals. SOF at ¶ 10; See 49 CFR §240.121; Ex. ECF 40-16, April 23, 2020 Email to EEOC, at NORFOLK_00000085.

15. Plaintiff failed the eye exam and was required to see his ophthalmologist to confirm his corrected vision met the appropriate standard. Plaintiff complied and was returned to work "without restriction as an engineer only" on February 27, 2017. ECF 40-15.

16. Plaintiff has been directed to see an ophthalmologist to confirm his vision met the appropriate standard after most of his vision tests. ECF 40-1, at pp. 76:15-78:2

17. In accordance with FRA regulations, engineers must undergo periodic medical reviews to maintain their certification. SOF at ¶ 13; See 49 CFR §240.121; Ex. 40-16, April 23, 2020 Email to EEOC, at NORFOLK_00000085.

18. In order to be certified as a locomotive engineer, engineers are required to complete vision and hearing screenings every three years; "no railroad shall certify a person as a qualified locomotive engineer for an interval of more than 36 months." SOF at ¶ 14; 49 CFR §240.217(c)(1); see also 49 CFR §240.121.

19. Engineers must meet the regulatory vision standard which requires "(i) distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses, or (ii) Distant visual acuity separately corrected to at least 20/40 (Snellen) with corrective lenses and distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses." SOF at ¶ 15; 49 CFR §240.121.

20. Norfolk Southern requires engineers to complete a Periodic Health Assessment every three years which tests hearing levels, and vision to ensure the engineer meets the minimum safety requirements. The Periodic Health Assessment also includes a questionnaire to report any medical conditions and prescribed medications, and a check of vitals. SOF at ¶ 16;

See ECF 40-16, April 23, 2020 Email to EEOC, at NORFOLK_0000008; ECF 40-5, Deposition Transcript of A. Euell, at pp. 76:2-8; 49 CFR §240.121; 49 CF §240.217(c)(1).

21. Plaintiff had last completed a Periodic Health Assessment three years prior when he returned to work as an engineer in 2017. SOF at ¶ 17; See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 63:10-2.

22. Therefore, on July 20, 2020, Plaintiff underwent a Periodic Health Assessment. SOF at ¶ 18; See ECF 40-17, July 20, 2020 Periodic Health Assessment, at NORFOLK_00000256-263.

23. The July 20, 2020 vision test within the Periodic Health Assessment revealed that Plaintiff's vision did not meet the regulatory standard for an engineer. SOF at ¶19; See ECF 40-17, July 20, 2020 Periodic Health Assessment, at NORFOLK_00000256-263; ECF 40-5, Deposition Transcript of A. Euell, at pp. 75:23-76:1; ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 80:5-12; ECF 40-18, July 27, 2020 Letter from NSHS, at Plaintiff's RFPOD 000001-4; ECF 40-16, April 23, 2020 Email to EEOC, at NORFOLK_00000085.

24. During the July 20, 2020 Periodic Health Assessment Plaintiff also reported prescription medication used [to] treat his seizure disorder on his health questionnaire. SOF at ¶ 20; See ECF 40-17, July 20, 2020 Periodic Health Assessment, at NORFOLK_00000256-263; ECF 40-5, Deposition Transcript of A. Euell, at pp. 76:2-14; ECF 40-16, April 23, 2020 Email to EEOC, at NORFOLK_00000085.

25. On July 21, 2020, Plaintiff's skills to safely operate a locomotive were assessed on a locomotive simulator. SOF at ¶ 21; See ECF 40-19, July 21, 2020 Performance Evaluation, at NORFOLK_00000031.

26. To determine Plaintiff's fitness-for-service as of 2020, Norfolk Southern Health Services ("NSHS") requested in a letter dated July 27, 2020 from Francesca Litow, M.D., MPH that Plaintiff provide up-to-date records from his eye doctor confirming his "best corrected distance vision in each eye" and also requested up to date medical records relating to his disclosure of seizure medication on the questionnaire. Specifically, NSHS requested:

> "Office visit notes from threating neurologist. Office visit note or written statement from treating neurologist addressing: date of last known seizure; treatment, including prescribed medication and any significant safety-impairing medication side effects[he] may be experiencing; risk of experiencing a recurrent seizure within the next six (6) months to one year; recommended work restrictions and/or accommodations, and if any, their anticipated duration; if hospitalized, the "hospital admission summary" and "physician's discharge summary." Please request these documents from the Medical Records Department of the hospital. It is not necessary to provide all of the hospitalization records; diagnostic test results, including EEG report and MRI; lab results (including medication levels if applicable)."

SOF at ¶ 22; ECF 40-18, July 27, 2020 Letter from NSHS, at Plaintiff's RFPOD 000001-4; ECF 40-8, Deposition Transcript of A. Euell, at pp. 75:23-76:14.

27. NSHS resolved its concern with Plaintiff's distance vision after receiving additional information from Plaintiff's ophthalmologist.

28. On May 18, 2020, Plaintiff had a virtual telehealth visit with Dr. Majeed. Dr. Majeed did not conduct a physical examination of Plaintiff. In her telehealth visit notes, Dr. Majeed noted that Plaintiff "had a history of complex partial

seizure with secondary generalization breakthrough seizure for more than 5 years, last MRI of brain no acute pathology postsurgical changes noted due to history of meningloma removal. Meningloma discovered when the patient had a seizure status post meningloma removal currently on Keppra and Vimpat." Under Assessment/Plan, Dr. Majeed wrote "complex partial seizure continue on Vimpat 150 mg twice a day as directed continue on Keppra 500 mg in the morning 500 mg at noon time and 1000 mg at bedtime as directed we will obtain Keppra level and will obtain screening blood work." Dr. Majeed further noted that Plaintiff's mental status was "alert, oriented to person, place, time and situation." ECF 40-20, August 5, 2020 Fax from Dr. Majeed, at NORFOLK

29. The telehealth visit notes did not provide the date of Plaintiff's last known seizure, did not describe any side effects from his medication, and did not identify the likelihood of a recurrent seizure. See ECF 40-20, August 5, 2020 Fax from Dr. Majeed, at NORFOLK_00000358-360.

30. On August 5, 2020, Dr. Majeed faxed NSHS the telehealth visit notes from the May 18, 2020 telehealth appointment. SOF at ¶ 23; See ECF 40-20, August 5, 2020 Fax from Dr. Majeed, at NORFOLK_00000358-360.

31. In a letter dated August 5, 2020, Dr. Majeed wrote that "[Plaintiff] is a current patient in the neurology office being seen for his history of seizures. His seizures are controlled with the medications Keppra and Vimpat, and it has been more than five years since his last event. Recommended work restrictions for him include to not operate heavy machinery and to avoid

working at heights or on ladders." See ECF 40-21, August 5, 2020 Letter

from Dr. Majeed at NORFOLK_00000361.

32. On August 7, 2020, NSHS Medical Services Clinician Anita Euell ("Ms.

Euell"), called Plaintiff leaving a voicemail acknowledging receipt of the

telehealth visit notes and the August 5, 2020 restriction from operating heavy

machinery. Ms. Euell specifically inquired of Plaintiff whether this new

restriction was in error. See ECF 40- 14, NSHS Case Management Notes, at

NORFOLK_00000309.

33. On August 11, 2020, Plaintiff called Dr. Majeed's office and asked her to

"reword his work restrictions." SOF at ¶ 25; ECF 40-22, Dr. Majeed Internal

Office Correspondence, at Plaintiff's RFPOD 000064-65;ECF 40-1,

Deposition Transcript of J. Chadwick, at pp. 86:11-14.

34. On August 14, 2020, Dr. Majeed faxed NSHS a letter advising that "Patient may

return back to work. However, patient should not operate heavy machinery or climb

ladders independently. No other restrictions are required. Patient may do physical

activity as tolerated." ECF 40-23, August 14, 2020 Letter from Dr. Majeed at

NORFOLK_00000341.

35. On September 3, 2020, Dr. Majeed faxed NSHS a duplicate copy of the May

18, 2020 telehealth visit notes. SOF at ¶ 26; ECF 40-24, September 3, 2020

Fax from Dr. Majeed, at NORFOLK_00000342-345.

36. On September 23, 2020, Dr. Majeed faxed NSHS a letter dated September

15, 2020 in which she wrote "Patient has not had a seizure for the past 8

years. [Plaintiff] may return to work to continue previous activities. However,

**11**

patient should not operate heavy machinery independently due to standard seizure precautions. No other restrictions or accommodations are required. Patient may do physical activity as tolerated." ECF 40-25, September 15, 2020 Letter from Dr. Majeed, at NORFOLK_00000340.

37. On September 25, 2020, Dr. Majeed faxed NSHS a letter dated September 25, 2020 in which she wrote "[Plaintiff] may return to work to continue previous activities. Patient is ok to operate heavy machinery as long as another employee accompanies him in case of emergency. No other restrictions are required." ECF 40-26, September 25, 2020 Letter from Dr. Majeed, at NORFOLK_00000339.

38. In a letter to Plaintiff dated October 16, 2020, Dr. Litow advised Plaintiff that he was not cleared to return to duty "in your safety-sensitive job as an Engineer." She further informed Plaintiff that he was not being dismissed from service, "as this medical restriction from active service can be removed if your condition improves to the extent that you can safely return to work in your present job. As information, evidence-based guidance related to commercial drivers recommends a 10-year seizure free period for those diagnosed with seizure disorders." See ECF 40-27, October 16, 2020 Letter from NSHS, at Plaintiff's RFPOD 000019-20.

39. Plaintiff testified that he interpreted Dr. Litow's language in the October 16, 2020 letter, "[a]s information, evidence based guidance related to commercial drivers recommends a 10-year seizure-free period for those diagnosed with

seizure disorders" to mean "she wants me 10 years seizure free." ECF 40-1 at pp. 118-119.

40. The October 16, 2020 letter further informed Plaintiff that:

**To evaluate your ability to return to work we will need the following**:

<u>Seizure Disorder from August 15, 2020 forward</u>

• Office visit notes from treating neurologist.

• Office visit note or written statement from treating neurologist addressing:

  o date of last known seizure

  o treatment, including prescribed medication and any significant safety-impairing medication side effects that you may be experiencing

  o risk of experiencing a recurrent seizure within the next six (6) months to one year.

  o recommended work restrictions and/or accommodations, and if any, their anticipated duration

• If hospitalized, the "hospital admission summary" and "physician's discharge summary". Please request these documents from the Medical Records Department of the hospital. It is not necessary to provide all of the hospitalization records.

• Diagnostic test results, including EEG report and MRI

• Lab results (including medication levels if applicable)

ECF 40-27, at Plaintiff's RFPOD 000019-20 (emphasis in original); ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 115:10-117:5, 117:9-22, 118:3-119:21, 126:20-128:1; ECF 40-28, Deposition Transcript of Francesca Litow, at pp. 42:8-43:14; 45:1-46:12; 46:25-47:11.

41. The letter also advised Plaintiff that if he wished to be considered for employment in another vacant position for which he qualified and could work safely, he should contact Norfolk Southern's Vocational Rehabilitation Services ("VRS"). See ECF 40-27, October 16, 2020 Letter from NSHS, at Plaintiff's RFPOD 000019-20.

42. Plaintiff testified that Norfolk Southern is entitled to ask for additional information to determine his medical fitness relating to his vision and his seizure disorder. See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 80:13-23, 116:23-117:5. 2

43. Plaintiff did not provide the records requested by NSHS in the October 16, 2020 letter that would allow NSHS to determine if he could return to work. ECF 40-28, Deposition Transcript of F. Litow, at pp. 44:16-22;

44. Plaintiff was placed on "Medical Hold" and he was required to provide records confirming his distance vision and seizure disorder. See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 76:15-78:1.

45. According to Norfolk Southern, "Medical hold is a temporary removal of an employee from active service by NSHS. It may be issued for a variety of reasons including, but not limited to, failure to comply with instructions,

concern over personal or public safety, and pending receipt of medical information sufficient for NSHS to determine fitness-for-service." ECF 42-7, p.2 n.1.

46. Plaintiff's Career Service Record as of September 21, 2021 indicated he was on a medical hold. SOF at ¶ 27; See ECF 40-2, Career Service Record, at NORFOLK_00000425.

47. Plaintiff admitted that Dr. Litow's October 16, 2020 letter did not say he "could not return to work". See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 126:20-128:1; 153:10-154:18.

48. Plaintiff testified that he did not recall seeing the part of the October 16, 2020 letter inviting him to contact VRS. See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 112:7-113:17.

49. Plaintiff averred that "I participated in the NS vocational services back in 2015 and was informed that I had to relinquish my seniority rights as an engineer. I want to return to work as an engineer with my seniority dating back to 1988." ECF 42-5.

50. Other than calling Norfolk Southern's Employee Resource center ("ERC") one time to get his password reset, Plaintiff did not communicate with NSHS regarding his return to work after receiving the October 16, 2020 letter. See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 144:10-20.

51. Dr. Litow testified that she did not recall speaking with or writing to Dr. Majeed to request clarification of any of Plaintiff's conditions or restrictions. ECF 40-

28 at p. 38. Nor did Dr. Litow recall whether Ms. Euell had communicated with Dr. Majeed. *Id*. at 39.

52. Dr. Litow testified that she is not a neurologist and did not consult with a neurologist prior to writing her October 16, 2020 letter. *Id*. at 49-50.

53. Dr. Litow testified that she could have requested that Plaintiff be evaluated by an independent neurologist but only if Plaintiff had provided the requested information in the October 16, 2020 letter. *Id*. at 39-40.

54. Ms. Euell testified that the medical director/chief medical officer (Dr. Litow) had the authority to have requested a medical specialty evaluation, functional capacity exam or field test of Plaintiff. ECF 40-5 pp. 64-66.

55. Plaintiff admitted he did not request or need an accommodation. SOF at ¶ 28; See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 131:11-132:23.

56. Plaintiff admitted that Dr. Majeed did not request an accommodation on his behalf. SOF at ¶ 29; See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 131:11-132:23.

57. Ms. Euell testified that in 2020, Norfolk Southern was operating with a two-member crew consisting of an engineer and a conductor. ECF 40-5, p. 52.

58. NSHS notified Plaintiff's supervisor, Shaun McCoy, that Plaintiff's treating physician had imposed the following work restriction on Plaintiff: "Patient is okay to operate heavy machinery as long as another employee accompanies him in case of an emergency." See ECF 40-4, Deposition Transcript of S.

McCoy, at pp. 45:10-46:1; ECF 40-5, Deposition Transcript of A. Euell, at pp. 46:4-12; 78:10-79:2; ECF 40-29, at NORFOLK_00000170-173.

59. Upon reviewing the work restriction, McCoy notified NSHS that as "an engineer it isn't possible to have another employee on the locomotive with [Plaintiff] at all times. So I cannot reasonably accommodate his request." See ECF 40-29, at NORFOLK_00000170-173.

60. McCoy testified that his words "at all times" came from Dr. Majeed's letter of September 25, 2020. ECF 40-4, at p. 45.

61. Nowhere in Dr. Majeed's September 25, 2020 letter did she require "another person in the locomotive" and/or "at all times." Dr. Litow testified that the words "another person in the locomotive" do not appear in Dr. Majeed's letter of September 25, 2020. ECF 40-28 at 31.

62. Only a certified engineer can operate a locomotive. See ECF. 40-4, Deposition Transcript of S. McCoy, at pp. 33:12-13. A conductor can operate a locomotive provided the conductor is a certified locomotive engineer. *Id*.

63. All conductors, including those who are not certified locomotive engineers have training and are authorized to stop a locomotive if there is an emergency. See ECF 40-4, Deposition Transcript of S. McCoy, at pp. 37:18-38:2.

64. In the NSHS Case Management Notes dated October 28, 2020, Dr. Litow wrote: "[Plaintiff] has provided records already on file, [Plaintiff] has been medically DQ due to seizure disorder unable to accommodate MD request for 'another person in locomotive' as noted." ECF 40-14, p.2.

65. In the Case Management Notes dated September 28, 2020, Ms.

   Euell wrote:

> Request case review for LE EE with history of seizures.
> Neurologist recommended that another employee
> accompany him in the event of an emergency. Should email
> be sent WRT accommodation or clear based on history of 2-
> person T & E crews? Thanks.

   ECF 40-14, p. 5.

66. In the Case Management Notes dated September 28, 2020, Ms. Euell wrote:

> Reviewed letter dated 09/25/2020 from Dr. Warqaa Majeed,
> advising in part that EE may RTW to continue previous duties
> and that EE is okay to operate heavy machinery as long as
> another employee accompanies him in case of an emergency.
> Case deferred for Dr. Litow's review.

   ECF 40-14, p. 4.

67. Ms. Euell testified that this entry meant that "[b]ased upon the restriction that

   another person always accompany him–there's a two-person crew. Would he

   be able to be cleared to return to work based on the fact that there is someone

   in the cab with him?" ECF 40-5, pp. 56-57. Ms. Euell testified that Dr. Litow did

   not respond to this question through MCM. *Id*. at 54. Ms. Euell further testified

   that she could not recall whether Dr. Litow responded to this question in

   another format. *Id*. at 58.

68. The Railroad Retirement Act provides disability annuities for railroaders who

   become totally disabled or occupationally disabled. See Disability Annuities

   for Railroad Employees, SOF at ¶ 30;

https://www.rrb.gov/Newsroom/Newsreleases/DisabilityAnnuitiesforRailroadEmployees.

69. Plaintiff applied for disability benefits through the Railroad Retirement Board ("RRB") claiming he had been medically disqualified, that "Norfolk Southern is requiring a 10- year seizure free period before returning to work," and "NS would not let [him] return." SOF ¶ at 31; ECF 1, at pp. 123:8-12, 126:6-8; ECF 30, Plaintiff's Application for Disabilities to RRB, at Plaintiff's RFPOD 000182-193.

Plaintiff also submitted the expert report of Kevin L. Trangle, M.D., MBA. of Kevin Trangle & Associates in Mayfield Heights, Ohio. Dr. Trangle conducted an independent review of Plaintiff's medical records for the purpose of determining the Plaintiff's fitness-for-service.  ECF 41-1. Dr. Trangle did not see or examine the Plaintiff. Dr. Trangle concluded that:

> The removal of Mr. Chadwick from active duty by NS Health Services on 07/28/2020 was completely unwarranted, inappropriate and inconsistent with professional standards of care. At that time, he had been completely seizure-free on a stable treatment regimen for more than 5 years since his last seizure. He was previously allowed back to work in 2017, just two (2) years after his last seizure based on the NS medical guidelines.
>
> NS Health Services retroactively applied a new policy which required him to be seizure-free for 10 years. This was not based on any persuasive medical literature or accepted medical standards, but instead, it appears this new policy was based on FMCSA guidelines which even at the time of the NS decision, had been abandoned. These guidelines were never intended for regulatory purposes in the railroad industry.
>
> Of importance, NS applied this new policy to Mr. Chadwick without consulting his neurologist. Despite the seemingly inconsistent opinion of Mr. Chadwick's treating neurologist with respect to necessary work restrictions, NS Health Services failed to directly communicate with his neurologist to clarify and discuss their actual necessity.

An independent review of the applicable literature and consultation with a specialist would have established that Mr. Chadwick required no specific work restrictions. Even if the noted restrictions were accepted as necessary, the evidence establishes that NS could have more than likely made reasonable accommodations.

Of note, these exemption criteria were based on the 2007 recommendations of the FMCSA's Medical Expert Panel which in turn were based on outdated medical literature. This is the very reason the FMCSA is currently developing new guidelines. Lastly, NS Health Services erred in removing Mr. Chadwick from his position due to a congenital condition affecting his left eye. This condition was responsible for a stable visual status which neither precluded Mr. Chadwick from safely performing his job duties nor required any specific accommodations.

ECF 42-1 at pp. 14-15.


Plaintiff also submitted the expert report of Michael Devereaux, M.D., F.A.C.P., a Professor of Neurology at University Hospitals Cleveland Medical Center/Case Western Reserve University and a member of the Epilepsy Center faculty of the Department of Neurology at the Neurological Institute of University Hospitals Cleveland Medical Center. Dr. Devereaux was asked to comment on the likelihood of the Plaintiff continuing to be seizure free in order for him to return to his job as a railroad engineer. ECF 41-2. Dr. Devereaux did not see or examine the Plaintiff. Dr. Devereaux concluded that:

It is easy to state that his risk of recurrent seizures after five (5) years of being seizure free, when he was removed from duty, was at that time extremely low. He had been doing his usual job for over three (3) years at that point, when the company Norfolk Southern (NS) "discovered his history of a remote seizure, and even though he had been cleared for full duty three years earlier, now reversed its course of action. And in essence, imposed new such restrictions so that he was

not employable. I would estimate his risk at being less than one percent after the initial five (5) years of being seizure free, which is the point of time he was removed from work. Now almost eight (8) years later, the course of his health status has borne out the low likelihood of having a seizure then in 2020 and into the future.

*********

Every state in the Union allows an individual with epilepsy to return to driving when seizure free, for as little as 3 months in a number of states, and, no more than a year in other states. Recognizing the fact that being an engineer of a locomotive entails a potentially higher risk of danger to oneself, coworkers and public, nonetheless, the medical situation and the facts enumerated, the diagnosis and clinical findings, all support my professional opinion that [Plaintiff] could have continued to work and there was never a need to remove him from work in October 2020.

ECF 42-2.

## DISCUSSION

The Court first notes that with respect to Count Two which asserts a claim against Norfolk Southern under the ADA for failure to make a reasonable accommodation, the parties have stipulated that Plaintiff admitted during his deposition that he did not ask for or need an accommodation from Norfolk Southern. ECF 40; SOF at ¶ 28. The parties further stipulated that Plaintiff admitted that Dr. Majeed did not request an accommodation on Plaintiff's behalf. ECF 40; SOF at ¶ 29. In addition, the Court notes that Plaintiff did not respond to Norfolk Southern's motion for summary judgment on Count Two. For these reasons, the Court will enter judgment in favor of Norfolk Southern and against Plaintiff on Count Two.

The Court now turns to Plaintiff's sole remaining claim (Count One) that Norfolk Southern discriminated against him in violation of the ADA, RA and PHRA based on a medical disqualification.[1]

Despite Dr. Litow's notation in the NSHS Case Management Notes dated October 28, 2020, that Plaintiff "has been medically DQ due to seizure disorder," the record clearly reveals that Plaintiff was never actually medically disqualified from his position as a locomotive engineer. In her letter of July 27, 2020 to Plaintiff, Dr. Litow specifically wrote that "[y]our work status is Medical Hold until we are able to determine your fitness for service." ECF 40-18, p. 1. Plaintiff acknowledged that the July 27, 2020 letter so stated. See ECF 40-1, Deposition Transcript of J. Chadwick, at p. 79:20-23.

Dr. Litow further specifically informed Plaintiff in her October 16, 2020 letter that although "you are not currently cleared to return to duty in [his] safety-sensitive job as Engineer," he was not being dismissed from service, "as this medical restriction from active service can be removed if your condition improves to the extent that you can safely return to work in your present job." ECF 40-28 at p. 1. Plaintiff himself admitted that Dr. Litow's October 16, 2020 letter did not say he "could not return to work". See ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 126:20-128:1; 153:10-154:18. Indeed, the parties have stipulated that Plaintiff's Career Service Record as of September 21, 2021 indicated he was on a "medical hold." ECF 40. SOF at ¶ 27. Finally, Article 37(B) p. 164 of Plaintiff's CBA provides that "if an employee is medically disqualified the Chief Surgeon will promptly notify the employee, in writing, setting forth both the medical diagnosis of the employee's condition and the Company's minimum

---

[1] Claims brought under the ADA, RA and PHRA are analyzed under identical standards for liability. *See Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010).

medical standard which that condition does not meet." Ex. 32, at Art. 37(B) p. 164. The record in this case is devoid of any such notification. For these reasons, the Court finds that there is no issue of material fact as to whether Plaintiff was medically disqualified. He clearly was not and instead was placed on "Medical Hold", pending receipt of further requested medical documentation as outlined in the July 27, 2020 and October 16, 2020 letters sent to Plaintiff from NSFS.

In addition, there is no dispute that Norfolk Southern had every right to request additional medical documentation concerning Plaintiff's distance vision and history of seizures. The parties have stipulated that in accordance with FRA regulations, engineers must undergo periodic medical reviews to maintain their certification. SOF at ¶13. See 49 CFR §240.121; Ex. 16, April 23, 2020 Email to EEOC, at NORFOLK_00000085. The parties have further stipulated that in order to be certified as a locomotive engineer, engineers are required to complete vision and hearing screenings every three years. The regulations provide that "no railroad shall certify a person as a qualified locomotive engineer for an interval of more than 36 months." SOF at ¶ 14; 49 CFR §240.217(c)(1); see also 49 CFR §240.121.

Indeed, Norfolk Southern requires engineers to complete a Periodic Health Assessment every three years which tests hearing levels, and vision to ensure the engineer meets the minimum safety requirements. SOF at 16. The Periodic Health Assessment also includes a questionnaire to report any medical conditions and prescribed medications, and a check of vitals. *Id*. Since Plaintiff had last undergone a Periodic Health Assessment in 2017, Plaintiff was due for another one in 2020. Plaintiff underwent his Periodic Health Assessment on July 20, 2020. SOF at ¶ 18. The July 20,

2020 vision test within the Periodic Health Assessment revealed that Plaintiff's vision "did not meet the regulatory standard for an engineer." SOF at ¶19. During the July 20, 2020 Periodic Health Assessment, Plaintiff also "reported prescription medication used [to] treat his seizure disorder on his health questionnaire." SOF at ¶ 20.

To determine Plaintiff's fitness for service as of 2020, NSHS, in a July 27, 2020 letter to Plaintiff, requested Plaintiff provide up-to-date records from his eye doctor confirming his "best corrected distance vision in each eye" and also requested up to date medical records relating to his disclosure of seizure medication on the questionnaire. Specifically, NSHS requested: "Office visit notes from treating neurologist. Office visit note or written statement from treating neurologist addressing: date of last known seizure; treatment, including prescribed medication and any significant safety-impairing medication side effects[he] may be experiencing; risk of experiencing a recurrent seizure within the next six (6) months to one year; recommended work restrictions and/or accommodations, and if any, their anticipated duration; if hospitalized, the "hospital admission summary" and "physician's discharge summary." SOF at ¶ 22.

In response, on August 5, 2020, Dr. Majeed faxed to NSHS office visit notes from a May 18, 2020 telehealth appointment with Plaintiff. Since this was a telehealth visit, Dr. Majeed did not physically examine the Plaintiff. In her telehealth visit notes, Dr. Majeed noted that Plaintiff "had a history of complex partial seizure with secondary generalization breakthrough seizure for more than 5 years, last MRI of brain no acute pathology postsurgical changes noted due to history of meningloma removal. Meningloma discovered when the patient had a seizure status post meningloma

removal currently on Keppra and Vimpat." ECF 40-20 at p. 1. Under Assessment/Plan,

Dr. Majeed wrote "[c]omplex partial seizure continue on Vimpat 150 mg twice a day as

directed continue on Keppra 500 mg in the morning 500 mg at noon time and 1000 mg

at bedtime as directed we will obtain Keppra level and will obtain screening blood work."

*Id*. at p. 2. Dr. Majeed further noted that Plaintiff's mental status was "alert, oriented to

person, place, time and situation." *Id*. at p. 1.

However, the telehealth notes did not provide the information that was

specifically requested in its July 27, 2020 letter, including the date of Plaintiff's last

known seizure, any safety-impairing side effects Plaintiff may have experienced from his

medication, and the likelihood of a recurrent seizure within six months to one year. ECF

40-20. Instead, in a faxed letter that accompanied the telehealth notes, Dr. Majeed

wrote that "[Plaintiff] is a current patient in the neurology office being seen for his history

of seizures. His seizures are controlled with the medications Keppra and Vimpat, and it

has been more than five years since his last event. Recommended work restrictions for

him include to not operate heavy machinery and to avoid working at heights or on

ladders." See ECF 40-21, August 5, 2020 Letter from Dr. Majeed at

NORFOLK_00000361. On August 7, 2020, Ms. Euell, called Plaintiff leaving a voicemail

acknowledging receipt of the telehealth visit note and the August 5, 2020 restriction

from operating heavy machinery and inquiring whether this new restriction was in error.

SOF at ¶ 24.

Instead of complying with the requests for additional information contained in

NSHS's July 27, 2020 letter, Plaintiff, on August 11, 2020, called Dr. Majeed's office and

asked her to "reword his work restrictions." SOF at ¶ 25; ECF 40-22, Dr. Majeed Internal

Office Correspondence, at Plaintiff's RFPOD 000064-65;ECF 40-1, Deposition

Transcript of J. Chadwick, at pp. 86:11-14.

Dr. Majeed then sent NSHS a serious of follow-up letters in which she essentially

stated in various forms that it was "ok" for Plaintiff to return to work as long as another

employee accompanied him in case of emergency. ECF 40-23, 40-24, 40-25 and 40-26.

As a result of these letters, Dr. Litow advised Plaintiff in her October 16, 2020 letter that:

**To evaluate your ability to return to work we will need the following:**

Seizure Disorder from August 15, 2020 forward

• Office visit notes from treating neurologist.

• Office visit note or written statement from treating neurologist addressing:

 o date of last known seizure

 o treatment, including prescribed medication and any significant safety-

 impairing medication side effects that you may be experiencing

 o risk of experiencing a recurrent seizure within the next six (6) months to

 one year.

 o recommended work restrictions and/or accommodations, and if any,

 their anticipated duration

• If hospitalized, the "hospital admission summary" and "physician's discharge

summary". Please request these documents from the Medical Records

Department of the hospital. It is not necessary to provide all of the hospitalization

records.

 • Diagnostic test results, including EEG report and MRI

• Lab results (including medication levels if applicable)

ECF 40-27 (emphasis in original); ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 115:10-117:5, 117:9-22, 118:3-119:21, 126:20-128:1; ECF 40-28, Deposition Transcript of Francesca Litow, at pp. 42:8-43:14; 45:1-46:12; 46:25-47:11.

Yet, the record is undisputed that Plaintiff did not provide the records requested by NSHS in the October 16, 2020 letter that would allow NSHS to determine if he could return to work. ECF 40-28, Deposition Transcript of F. Litow, at pp. 44:16-22.  And Plaintiff himself admitted Norfolk Southern is entitled to ask for additional information to determine his fitness-for-service relating to his distance vision and his seizure disorder and that asking for such information is not discriminatory. ECF 40-1, Deposition Transcript of J. Chadwick, at pp. 116:23-117:5.

Under the ADA, employers are forbidden from "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability." 42 U.S.C. § 12112(d)(4)(A). Such inquiries are allowed, however, if "shown to be job-related and consistent with business necessity." *Id.*; *see also id.* § 12112(d)(4)(B) (permitting employers to "make inquiries into the ability of an employee to perform job-related functions").

Norfolk Southern's inquiries into Plaintiff's distance vision and seizure disorder were clearly job-related and consistent with business necessity. Although Norfolk Southern resolved its concern with Plaintiff's distance vision after receiving information from Plaintiff's ophthalmologist, each of Norfolk Southern's specific inquiries into Plaintiff's seizure history in 2020—which included request for more information about the date of Plaintiff's last known seizure, whether Plaintiff experienced any side effects from his medication, and the likelihood of a recurrent seizure—were related to Plaintiff's

safety-sensitive position as a locomotive engineer. Indeed, it was Plaintiff's own neurologist, Dr. Majeed, who started the ball rolling in her August 5, 2020 letter by clearing Plaintiff to return to work with the contingency that he should not operate heavy machinery or climb ladders independently. ECF 40-21. The information sought is clearly consistent with the necessity of ensuring that employees of Norfolk Southern with a potentially incapacitating or performance impairing medical condition are prohibited from performing duties of a safety-sensitive position until it is determined that the employee can work safely. This is especially true where, as here, NSHS was without any updated medical information on Plaintiff since 2017. Given its responsibility for public safety, Norfolk Southern was more than justified in requesting enough information for it to competently decide whether it was safe for Plaintiff to operate one of its locomotives. Even more significant is the fact that Norfolk Southern's requests for the additional medical documentation were required by federal regulation. "An employer should not be required to defend its adherence to a binding federal safety regulation, even when that regulation conflicts with the goals of the ADA." *Bey v. City of New York*, 999 F. 3d 157 (2nd Cir. 2021).

Plaintiff argues that both Dr. Trangle and Dr. Devereaux established that based on their review of the Plaintiff's records there was not a likelihood that Plaintiff would suffer a recurrent seizure and therefore there was no need for Norfolk Southern to request additional documentation about Plaintiff's seizure condition to satisfy safety concerns or federal requirements. "But expert testimony is not sufficient to create an issue of triable fact when a course of action is required by federal regulation." *Coffey v. Norfolk Southern Railway Co.* 23 F. 4th 332, 341 (4th Cir. 2022). As discussed, *supra*,

Norfolk Southern's inquiries were compelled by binding FRA regulation, and therefore there can be no violation of the ADA, the Rehabilitation Act or the PHRA.

Plaintiff also argues that Dr. Litow referenced the incorrect standard when she wrote in her October 27, 2020 letter to Plaintiff that "[a]s information, evidence-based guidance related to commercial drivers recommends a 10-year seizure free period for those diagnosed with seizure disorders." ECF 40-27. According to Plaintiff, Dr. Litow referenced an outdated standard for commercial drivers and not the current standard for locomotive engineers. Even assuming, arguendo, that Plaintiff is correct, the fact remains that there is no evidence that Dr. Litow's use of the 10-year standard played any role in her decision to place Plaintiff on "Medical Hold." By her own language ("as information", Dr. Litow was only advising Plaintiff of the 10-year standard, not basing her decision on that standard. To the contrary, Dr. Litow's decision to place Plaintiff on "Medical Hold" was clearly the result of Plaintiff's July 20, 2020 Periodic Health Assessment and Dr. Majeed's August 5, 2020 letter which placed a new contingency on Plaintiff returning to work. Therefore, Dr. Litow would have still needed the additional requested information from Plaintiff no matter if the standard was two years, three years or 10 years.

Since Plaintiff was never actually terminated or medically disqualified by Norfolk Southern and instead placed on a medical hold, the Court will deny Norfolk Southern's motion for summary judgment without prejudice. Plaintiff will be allowed 60 days from the date of this Order to supply NSHS with the requested medical documentation in its letters of July 27, 2020 and October 16, 2020. If Plaintiff fails to comply, Norfolk Southern will be permitted to renew its motion for summary judgment. If Plaintiff does

comply, the Court trusts that NSHS will conduct a thorough review of the medical evidence and issue a fair and prompt decision on whether Plaintiff may or may not return to his job as a locomotive engineer. If Plaintiff is not satisfied with the decision, he may proceed further with this suit to the extent he can prove Norfolk Southern acted in a discriminatory manner.